## BARNEY v. LEEDS.

CONCERNING THE HOMESTEAD LAW, ACT OF 1851—LAWS, CH. 1089.

The family homestead is the residence or dwelling-place of a family.

A widower, having a minor child residing with him and supported by him, at his own dwelling-place, is the " head of a family," within the meaning of the homestead act of 1851.

As such " head of a family," he is secured by the law of 1851 in the possession, enjoyment of, and title to a homestead right to the extent of five hundred dollars in value, exempt from attachment and levy or sale on execution.

This right thus acquired is not lost or destroyed by the arrival of his only child at years of majority, and the removal of the child from the homestead, the father still continuing to occupy the premises as his own dwelling-place and home.

A debtor's right of homestead is not lost nor waived by the debtor's neglect to make application to an officer levying an execution upon his lands, to have such homestead set off to him, as provided by sec. 3 of the homestead act [of 1851].

An execution may properly be extended upon real estate in which a right of homestead exists, subject to such right of the debtor, in case the debtor (or his wife, if the debtor has a family) does not make application to the officer executing the writ to have a homestead set off to him in severalty.

A creditor, causing the real estate of his debtor to be set off on execution, subject to a family homestead, is estopped to deny the validity of the debtor's then existing homestead right.

The right of homestead, before the same has been set off and assigned, is not such an estate or interest in the land wherein it exists as will bar a writ of entry therefor by a creditor who has levied an execution thereon, subject to the debtor's homestead right.

Where a creditor causes the estate of his debtor, of greater value than the homestead right of the latter therein, to be set off on execution, subject to such homestead right, the creditor and the debtor, after the levy of the creditor's execution, and before any proceedings by either for a separation and assignment of their respective interests, are tenants in common of the estate.

A creditor levied an execution on the estate of his debtor, and caused the same to be set off to him in part satisfaction of his execution, subject to a family homestead. He subsequently brought a writ of entry to recover the premises thus set off, and had judgment thereon for a writ of possession, subject to the defendant's homestead of $500. Upon petition by the creditor for partition,—*held*, that the committee appointed to make such partition should assign to the debtor, by metes and bounds, so much of the estate as they might find to have been of the value of $500 on the date of the completion of the levy thereon, not at the time when partition is made.

WRIT OF ENTRY, by Eleazer Barney against Carey Leeds, for a parcel of land in Canaan, in this county.

The cause was tried by the court. The plaintiff's title was by the extent of an execution in favor of the plaintiff against the tenant, completed September 22, 1866. It appeared by the extent that the land was appraised at one hundred dollars, " being (as stated in the appraisers' certificate and in the return) subject to a family homestead," and was so set off. It appeared also in evidence, that the parcel of land so set off consisted of about one and one fourth acres, with a house and other buildings thereon, all occupied by the tenant for many years before as a family home for himself and his children, he being a widower with four children, his wife having died in 1858. Prior to the death of the defendant's wife in 1858, the premises in question had been occupied by the defendant, his wife, and children for several years as their only homestead. At the time of the extent, one only of his children,—Horace, born in April, 1848,—was a minor ; one other, —Augusta, born April 16, 1845,—lived with the tenant at this place, and went West in June, 1869, having been married shortly before ; and a little before that Horace left and went West. The other two children were away. After the two youngest left him, the tenant continued to make this place his home,—doing his own housework when there, assisted occasionally by his oldest daughter, Tryphenia (and others), who is married and lives at Enfield, in this State,—the tenant still expecting the two youngest children to return to him, from what they had said and written to him, the daughter ˙‑‑˙ returned from the

West with her husband, and residing temporarily with her sister in
this State.

It appeared that the tenant owned this land at the time of the ex-
tent, but no other, then or since, but that he made no application to
have a homestead set off; and that the officer delivered seizin of the
land set off to the creditor, who accepted the same, and the extent was
recorded.

The tenant moved for a nonsuit, which was denied, subject to his
exception.

And the court found that the tenant did disseize the demandant in
manner and form as he has alleged—subject to the tenant's exceptions.

The questions of law arising on the case were reserved for the
whole court.

*Shirley*, for the tenant.

A prominent and most important question in this case is, What con-
struction shall be given to that composite chaos, chapter 1089, act of
July 4, 1851, entitled " An act to exempt the homesteads of families
from attachment and levy or sale on execution "?

Has a man any rights under that homestead act? or, do all the
rights belong to others, while all the responsibilities belong to him? Does
that law turn the father out of doors—deprive him of his homestead—
because the dispensation of Providence deprives him of his wife and
children, or disperses the latter, or permits them to live till they are
more than twenty-one years of age?

Let us dig down to hard pan. I propose to recount the history of
the legislation of this State upon the subject of homestead rights. [The
learned counsel then presented an elaborate view of the course and
progress of legislation upon the subject, from its commencement by the
first petitions for a homestead exemption, to the enactment of the
statute of 1851.]

To acquire a homestead, is one thing; to retain it, when acquired, is
another. Our position,—and it is that of very many of the ablest men
in the profession,—is, that marriage is not a pre-requisite, a condition
precedent, to a man's acquiring a homestead. The statute is somewhat
incongruous from its composition, but it certainly does not provide, in
terms, that a man must be married in order to acquire a homestead;
and it seems to us that it cannot be said to require it by any reasonable
interpretation or fair implication.

The petitioners for such a law never contemplated anything of the
kind; and such seems to us the weight of authority as to statutes
couched in similar terms in other States. It seems to us that the last
bill, as reported by Whidden from his committee, or as passed, does not
prohibit the unmarried man from acquiring a homestead. Such a con-
struction would be extremely rigid, and would defeat, in many cases,
the humane purposes of the law. If an unmarried man has a house
and lot which he treats as his home, where he maintains his parents in

their declining hours, or his brothers or sisters in their tender years, he comes, certainly, within the equity of the act; and it seems to us that he is within the most rigid construction, " the head of a family," and that his *homestead* is protected for his and their benefit.

Webster defines "family" to mean "the collective body of persons who live in one house, and under one head or manager."

Worcester defines it to be " persons collectively, who live together in a house or under one head ; household."

The statute of Iowa provides, " the homestead of every head of a family is exempt," &c. " A man is regarded as the head of a family, though without wife or children, as long as he continues to occupy the house used as such at the time of the death of his wife." *Parsons* v. *Livingston & Kinkead*, 11 Iowa (Withrow) 106.

" The head of a family, primarily, is the husband or father: one may be such, however, without being either."

Thus, the mother may become such upon the death of the husband ; so a son, having a mother, brothers, or sisters, or either, depending upon him for support, and being in a household he controls, might be such head ;—and thus we might state many cases where the party claiming exemption would be legally entitled to it, and still not be the husband or father,—and yet, in such case, he must, for the purposes of this inquiry, stand in the place of the father, he must be the master, in law, of the family." *Whalen* v. *Cadman*, WRIGHT, J., 11 Iowa 228, and see authorities hereafter cited.

The code of Georgia, sec. 2013 (Jan. 1, 1863), provides, like ours, that the homestead of " the head of a family " shall be exempt, &c. The court holds that " an unmarried man, whose indigent mother and sisters live with him and are supported by him, is the head of a family." *Marsh* v. *Lazenby*, decided July 5, 1870.

If the head of a family owns real estate and lives on it, we take it to be quite clear that it is not necessary that there should be a house on it to entitle him to his exemption. He has the right to live in a cave in the ground, in a barn, in a tent, under a tree, or, as in the case of the birth of the Saviour, in a manger. It is enough, under our statute, if he occupies real estate as his home. In this case, there can be no question that the debtor acquired the homestead on which he now lives when he had a wife and children living, and that for years, and until the wife's death, he and they occupied it as such, nor that it then was exempt from the debt on which the judgment was founded. Has the debtor *forfeited* that right by the death of his wife, and the fact that the children have become twenty-one years of age ?

Death is certainly not " a release or waiver " in any just sense of the term. See *Weymouth* v. *Sanborn*, 43 N. H. 175.

It is to be observed that our statute puts the homestead in the head of the family, and such has been the uniform construction given by our court. Others may have rights in it, but it is *his* homestead. " It [the act] exempts the homestead which it sets up in the lifetime of the owner for *his* benefit." *Norris* v. *Moulton*, 34 N. H. 395, top of page.

" The act creates and sets up in every owner of the estate or property occupied by him as the head of a family for *his* family dwelling," &c. Same case 395, 396. " It [the act] has a more liberal and consistent purpose in securing to all alike the benefits of the homestead which it creates as a right in the *head* of every family during his life." *Fletcher* v. *State Capital Bank*, 37 N. H. 391. " The right to be so set off is *his* homestead, to be exempted from attachment and levy or sale on execution against *him*, the head of the family, as the judgment debtor ; and if set off on the application of the wife, it is to be for *his* and her benefit, in *his* right and during his life." Same case, p. 395.

The doctrine of *Strachn* v. *Foss*, 42 N. H. 47, is, that the wife or minor children have no homestead right except what comes through the husband. The court, in *Miles* v. *Miles*, 46 N. H. 265, say, of the doctrine that the right of a wife in a homestead is a " vested interest,"—"A similar construction, we think, is to be given to our statute relating to the family homestead that is exempt from attachment and execution during the life of the husband." The court also hold in this case that the words " widow " and " wife " are merely terms of description, and that she is entitled to a homestead although afterwards married.

If these terms are mere description, so is the term husband used in the same act : he is as much a husband after his wife's death, as she a widow, &c., after her remarriage.

In *Tucker* v. *Keniston*, 47 N. H. 267–272, a leading and very carefully considered case, it is held that the homestead right of the debtor is an " estate." That he was " to be left at full liberty to sell, exchange, or mortgage *his* homestead, subject only to the claims of the wife and minor children." Same case, p. 268. That the debtor " is ordinarily the owner of the *entire* estate, and not of a mere life interest." Same case, p. 268. The act itself provides that such homestead shall be set out as *he* may select; and the court, in *Tucker* v. *Keniston*, say, " whereas, in respect to the husband, the *entire* estate is *vested* in him." Same case, p. 270.

The law leans strongly against the forfeiture of homestead estates by condition *subsequent*. *Locke* v. *Rowell*, 47 N. H. 46–51. It will enforce such penalty only for " the unequivocal purpose or *act of the* " *person* entitled to homestead. Same case, p. 50 ; *Meader* v. *Place*, 43 N. H. 307, 308.

There is nothing in the act which warrants the harsh interpretation, that this defendant shall lose his homestead because of the death of his wife, which was the act of God, and which he could not prevent. We have already commented upon the terms used in the previous bills, and on the fact that every bill or provision was swept away by the feeling in favor of a liberal act.

We now call the special attention of the court to two provisions of the bill which, as amended, subsequently became the law. Section 1 provided, " Such exemption shall continue after the death of either the husband or wife, for the benefit of the survivor and minor children,"

&c. Section 3 provided that the sheriff should set off, &c., " on application of the debtor, or his wife, *if* such debtor have a family."

Taking these two provisions together, there could be no possible doubt as to their meaning. If the debtor and his wife were both alive, either could make the application ; but if she were dead, he could make it, if he alone were living. The latter provision stands in chapter 1089 in the same words and in precisely the same connection as in the reported bill, and means the same. The change in the phraseology of the clause first cited was made on the motion of Mr. Quincy of Rumney. It was plainly not his purpose to change the legal effect of the bill as it then stood. His view must have been that where the husband owned the real estate, and the law vested the homestead in him, it was wholly unnecessary to declare that it continued in him, and should not be forfeited by acts over which he had no control; which is rendered still more apparent by the fact that section 2, substituted by him, is section 2 as reported, in fewer words ; and such is the construction given by some of the ablest courts in other States to similar provisions. The first part of section 1, as substituted by Mr. Quincy, and the retention of the other clause, show his purpose.

The clause we have cited from section 3 shows that the debtor had, by fair implication, a right to have *his* homestead set out when he had no wife or children left.

The cases in this State have all gone in this direction. Whether the husband, without cause, drives his wife away, or she, of her own wrong,—or the minor children,—abandon him, the homestead right is forfeited by neither. *Atkinson* v. *Atkinson*, 37 N. H. 436 ; *Atkinson* v. *Atkinson*, 40 N. H. 251 ; *Strachn* v. *Foss*, 42 N. H. 44 : *Meader* v. *Place*, 43 N. H. 308.

The supreme court of Massachusetts, under a statute in general more restrictive than our own, but with the same provision in relation to the wife and minor children after the husband's death as ours, have settled that " an *estate* of homestead is not defeated by the removal of the wife and children of the householder from the premises, or by her obtaining a divorce and a decree giving her the custody of the children," " or by the death or absence of his wife and children." *Doyle* v. *Coburn*, 6 Allen 71–73 ; *Silloway* v. *Brown*, 12 Allen 34.

The statute of Texas, like ours, exempted " the homestead of the head of each family." The supreme court of Texas has decided that "the death of the wife while it was his homestead, and his having no children, did not destroy its distinctive character of a homestead ; he continued to reside there with his slaves, hirelings, and niece, and her husband, Mr. McAllister. If he had been without servants or any one with him after the death of his wife, it would have been his homestead so long as it continued to be his residence." *Wood* v. *Wheeler*, HEMPHILL, C. J., 7 Texas 13–26 ; *Taylor* v. *Boulware*, 17 Texas 77.

So, in Iowa, " where a widower without children acquired real property, which he occupied as a homestead for himself and his mother, who was the sole member of his family," it was held that he was the

head of a family within the meaning of the statute, and that the prem-
ises so occupied were exempt from levy, &c.    *Parsons* v. *Livingston &
Kinkead*, 11 Iowa (Withrow) 104 ;  *Whalen* v.  *Cadmen*, 11 Iowa 226–
228 ;   *Burns*  v. *Keas*,  21  Iowa  257 ;   *Byers*  v. *Byers*,  21 Iowa  268 ;
*Langworthy* v. *McKelvey*, 25 Iowa 48 ;  *Dodds* v.  *Dodds*, 26 Iowa 312.

If  our  conclusions  are  sound,  the  defendant,  in  this  case,  stands
to-day precisely as if his wife were still alive, and they all, to this day,
had occupied the premises as their homestead.

What then ?

The plaintiff has shown by his acts that he would not have claimed
to hold the  premises upon this levy if the  defendant's wife were still
living, and his children under twenty-one, and all  upon  the premises.
He slept upon his levy until all had left except the father ; besides,
all the defendant did was to live there and take the profits.  Few things
are better settled than that this does not amount to an ouster.    There
was no evidence at the trial beyond this.

*Murray*, for the demandant.

The authorities cited from Iowa can have no bearing on the case,
because their code provides that a widow or widower, though without
children, shall be deemed the head of a family while continuing to oc-
cupy the house used as such at the time of the death of the husband
or wife.    See Laws of 1860, page 403, chap. 98, sec. 2278, code 1246.
It is, we think, fair to presume that the legislators of Iowa deemed such
a provision  necessary, in order to secure  the  homestead to the widow
or widower where there were no minor children, in case of the death of
husband or wife.    SCOTT, J., in *Sears* v. *Hanks*, 14 Ohio 300, 301, says,—
" The humane policy of the homestead act seeks not the protection of
the debtor, but its object is to protect his family from the inhumanity
which  would  deprive  its  dependent  members of  a home.    Its benefits
can only be claimed by heads of families—married persons living to-
gether as husband and wife, and widowers or widows having unmarried
minor child or children  residing with them as a part of their family."
The  provision  of the  Ohio  legislature is,—" The family homestead of
each head of a family shall be exempt."    Also, sec. 4 of the same stat-
ute provides that " Every widower or widow, having unmarried minor
child or children residing with him  or her as a part of his or her fam-
ily, shall have the benefit of this act in the same manner as married
persons ; and married persons living together as husband and wife shall
be entitled to the exemption in this act provided, although they shall
have no children."    From this it is clear that a widower, like the de-
fendant in this case, in Ohio would not be  entitled to a homestead.
Their statute is similar to ours : theirs, " the family homestead of each
head of a family ;" ours, " the family homestead of the head of each
family."    The statute is, " the head of each family."    Webster says,—
" Family means the collective body of persons who live in one house,
and under one head or manager ; a household, including parents,

children, and servants, and, as the case may be, lodgers or boarders."
Now, how can it be claimed that this defendant is the head of a family?
In order to hold a homestead, he must be the head of a family, and that
family must reside with him upon the homestead. The case does not
find any such fact. His wife is dead; the four children have arrived at
majority; the two girls are married and living away; the other two
are boys,—one in California, the other in the West, and have been gone
for more than two years; the defendant making this place his home,
doing his own work *when there*, assisted occasionally by Tryphenia and
others. The fact is, no one has lived with the defendant upon this
place for more than two years. Who are the family? It must be a
collective body of persons who live in one house. The defendant there
alone cannot be the head of a family. We think a humane and just
construction of the statute would be to give a homestead to a widower
who had minor children living with him upon the homestead during
their minority. Even if it could be claimed that he is the head of a
family when the adult children continue to reside with him, we think
it is certain that those children must continue to reside with him upon
the homestead in order to constitute a family. See 11 Iowa 226; 10
Allen 425. The defendant's expectations as to his children's return-
ing can have no bearing, as we can see, in this case. When they ar-
rive at majority, and choose to seek a home elsewhere, and do so, then
the family relation, as such, ceased to exist, and their returning after-
wards would not revive the right of the defendant to a homestead, if
such right existed before the separation of the family. Sec. 1 of the
act of 1851 provides that the homestead shall not be assets, nor sub-
ject to the laws of distribution or devise, so long as the widow or minor
children, or any or either of them, shall occupy the same. Sec. 3 pro-
vides that "The sheriff, executing any execution founded on any
judgment such as is mentioned in the first section of this chapter, on
application of the debtor or his wife, *if such debtor shall have a family*,
and if the lands and tenements about to be levied on or any part thereof
shall be the homestead and estate thereof." Now from sec. 1, it seems
clear that the statute was intended for the protection of the head of
such family—a person having a family living with him on the home-
stead, a widow and minor children, and those only; and that sec. 3
provides, in case of the sheriff making a levy, the debtor has no pro-
tection unless such debtor shall have a family, clearly showing that it
was not intended that a widower or a man having no family should
hold a homestead. We claim that the law was intended for the pro-
tection of the wife, widow, and minor children. Such a construction
would make the old law in harmony with the new, and no matter when
the homestead was acquired, all parties would stand alike. It is true
that in Massachusetts they have held that the death of the wife and ab-
sence of the children would not deprive the widower of a homestead; but
it is upon the ground that others are adopted as members of the house-
hold, which the defendant has not done. *Doyle* v. *Coburn*, 6 Allen 73.

II. The presumption of law would be that the execution was

regularly issued. It is not necessary that it should appear on the face of the execution that a motion was made to have the execution made returnable at a second subsequent term. If it appeared by the record, that would be enough; and it did so appear in evidence before the presiding judge.

III. An obvious mistake by an officer in the date of his return on an execution will not defeat the levy, and if there be two dates which are inconsistent with each other, one of them will be rejected. *Shove* v. *Dow*, 13 Mass. 529.

IV. If the court should be of opinion that the defendant is entitled to a homestead in the demanded premises, then the plaintiff should have judgment, subject to the right of homestead and the possession incident thereto. The plaintiff's and defendant's rights would be like those of tenants in common, holding by several and distinct titles, but by unity of possession. *Castle* v. *Palmer*, 6 Allen 401; *Silloway* v. *Brown*, 12 Allen 33–37; *Doyle* v. *Coburn*, 6 Allen 73.

FOSTER, J. The case before us calls for an answer to several very important questions, some of which are entirely new to the jurisprudence of this State.

The homestead exemption laws are of comparatively recent origin, nearly all of them having been enacted within the last twenty years. Homestead exemption is peculiarly an American institution. If anything similar to it exists in any other country, we are not aware of it. But, recent as is the inauguration of the policy, laws of this character now exist in as many as twenty-nine States of the Union. There is a general similarity in their provisions, and in the purpose and intention evinced by their authors; and yet, in important particulars, no two of them are precisely alike. The more recent legislators, borrowing to a large extent the language of the earlier laws, have invariably sought to engraft upon the borrowed stock supposed improvements, especially adapted to the condition of the people for whom the particular statute was designed. The result is a confused and almost inexplicable system, indicative of differing intentions, theories, and designs on the part of the law-makers, with regard to the practical application of the law, expressed, generally, without any very successful attempt at definition of terms or manifestation of meaning and purpose. The inevitable consequence is a conflict of judicial construction and interpretation, but a pretty general agreement of the courts and the legal profession in sentiments of disgust for the unsatisfactory and uncertain condition of this department of jurisprudence.

The common law has no analogous interest or estate,—the right of homestead exemption, as we have suggested, owing its creation wholly to statutes. This anomalous estate is generally treated of as being within the category of estates for life. 1 Washb. Real Prop. 325; *Norris* v. *Moulton*, 34 N. H. 396; *Fletcher* v. *State Capital Bank*, 37 N. H. 391; *Atkinson* v. *Atkinson*, 37 N. H. 436; *Miles* v. *Miles*, 46 N. H. 263; *Davis* v. *Andrews*, 30 Vt. 681; *Deere* v. *Chapman*, 25 Ill. 610; *Silloway* v. *Brown*, 12 Allen 30.

These statutes, it is said, are founded upon considerations of public policy. *Robinson* v. *Wiley*, 15 N. Y. 494.

" The general policy," says Mr. Washburn, " under which these laws have been instituted, has been to secure to a householder and his family the benefit of a home beyond the reach of legal process on the part of creditors."

The principles of construction applied to these statutes by some courts are of the strictest character, as to a statute in derogation of the common law (*Colson* v. *Nelson*, 3 Minn. 53), while other courts " have sought, even in terms of rhetoric, for adequate forms of expressing the liberal extent to which the statute should be carried." See *Gunnison* v. *Twitchel*, 38 N. H. 69 ; 1 Washb. Real Prop. 326. Mr. Ch. J. PERLEY, in *Buxton* v. *Dearborn*, 46 N. H. 44, has declared the recent opinion of this court to be that " the statute should have a liberal interpretation to accomplish the object of the law," not " a narrow construction, tending to defeat the humane object of the statute." That object was declared to be " to leave, for the upholding and support of a debtor's family, a property where they lived, not exceeding five hundred dollars in value, that should be protected from levy and attachment for his debts." In Illinois the statute is treated as a remedial measure, and is construed liberally. *Deere* v. *Chapman*, before cited.

A prominent object of the statute, in this State, has been said to be " the encouragement of unfortunate debtors." *Gunnison* v. *Twitchel*, before cited.

The extent of the execution against the tenant, upon which the demandant relies to sustain his writ of entry and to recover in this action, was completed prior to the enactment of the General Statutes, by which, and by subsequent laws, the homestead exemption act of 1851 has been to some extent amended and modified. Therefore, so far as the rights of the parties depend upon the construction of the homestead laws, it is the act of 1851 that now requires our consideration.

In the examination of the important questions thus presented, we have been materially assisted by the thorough investigation of counsel into the history of the legislation of this State upon this subject.

The first question presented is, whether, at the time of the extent of the execution upon the demanded premises, the tenant had any right of homestead therein. If he had, another question will be, whether he has since lost it, or in any way been deprived of it.

The parcel of land set off upon the demandant's execution consisted of about one and one fourth acres, with a house and other buildings thereon, all occupied by the tenant for many years before as a family home for himself and his children, he being a widower with four children, his wife having died in 1858. At the time of the extent, September 22, 1866, only one of his children was a minor ; one other, as well as the minor child, resided with the father upon the premises.

Was the tenant entitled to any homestead exemption, independent of his relation to a family ? The learned counsel for the tenant insists that the manifest intention and desire of the people petitioning

the legislature of 1850 was, to secure a right of homestead to every citizen or inhabitant of the State; that this is indicated, not only by the language of the petitioners (wherein they besought the legislature to pass a law in addition to or in extension of the exemption laws, which would secure to each " citizen " or " inhabitant " of this State a house and lot of " reasonable value," or " not exceeding five hundred dollars in value," or " a reasonable amount of real estate," or " reasonable quantity of land," and thus relieve them from the sad thoughts of " the lonely occupant of the poor-house "), but, also, by the general tenor of the bills introduced by those legislators who are designated as the pioneers in the movement (Mr. Pierce, of Hillsborough, and Mr. Whidden, of Lancaster), which bills, it is said, were the framework and foundation of the law ultimately enacted.

But whatever the petitioners or their advocates in the legislature may have desired and hoped for, it is manifest that the legislature very deliberately refused to confer a right of homestead exemption upon an unmarried citizen or inhabitant who was not the head of a family.

A bill introduced by Mr. Pierce, and another by Mr. Whidden, were referred to a select committee.

Mr. Pierce's bill, in its first section, conferred the right upon " any citizen"; Mr. Whidden's, upon " each head of a family." Mr. Whidden's bill also provided that " every widower or widow having an unmarried minor child or children residing with him or her, as part of his or her family, shall have the benefit of this act." The select committee reported neither of these bills,—but another, made up of these in part, and in part of the suggestions put forth by the committee. This bill exempted the real estate of " any citizen," and incorporated the provision from Mr. Whidden's bill, conferring the benefits of the act upon a widower having an unmarried minor child residing with him.

A motion to strike out this provision was refused, but a motion so to amend as to give the benefit of the act, not only to a widower or widow having an unmarried minor child, but to any other " unmarried person," was also denied.

The select committee's bill also provided that " such exemption shall continue after the death of either the husband or wife, for the benefit of the survivor and minor children," but this provision was stricken out by the House. No definite legislation was had during the session of 1850.

At the session of 1851 the law was enacted which we are now considering.

That law, instead of conferring the right of homestead exemption upon every citizen or inhabitant, as in Mr. Pierce's bill and in the bill reported by the select committee of the preceding legislature, limits the exemption to " the family homestead of the head of each family."

The provision of Mr. Whidden's bill conferring the benefits of the act upon " every widow or widower having an unmarried minor child or children residing with him or her as part of his or her family," is not incorporated in the act of 1851.

Instead of a provision in Mr. Pierce's bill that the exempted real estate shall not be deemed assets in the hands of any administrator or executor of the debtor, in case such deceased debtor shall have a wife or minor children, the law of 1851 provides (sec. 1) that it shall not be such assets " so long as the wife or minor children, or any or either of them, shall occupy the same."

A provision in the bill reported by the select committee, that " such exemption shall continue after the death of either the husband or wife, for the benefit of the survivor and minor children," is not to be found in the law of 1851.

Such is, in part, the history of the legislation which preceded the act of 1851; from which is to be inferred (as I think we shall conclude when we come to consider the law as it was finally enacted), not necessarily, that a widow or widower having an unmarried minor child or children residing with him or her as part of his or her family, should not in any case have the benefits of the act—very clearly not that the exempted real estate shall be deemed assets in the hands of an executor or administrator, notwithstanding the deceased debtor left a wife and minor children surviving him, nor that the exemption should in no case continue after the death of either the husband or wife, for the benefit of the survivor and minor children. That such was not the intention of the law-makers will become apparent when we come to consider the manifest objects and purposes of the law.

But we think it is quite apparent that the intention was not to confer the right of homestead exemption upon every citizen, independent of his relation to and connection and association with other persons.

" In the exposition of a statute, the intention of a legislator may be discovered from different signs.

"As a primary rule, it is to be collected from the words; when the words are not explicit, it is to be gathered from the occasion and necessity of the law, the defect in the former law and the designed remedy being the causes which moved the legislature to enact it." Dwarris on Statutes 184; *Hart* v. *Cleis*, 8 Johns. 44.

What, then, is the language of the act?

The first section exempts from attachment and levy or sale on execution, on any judgment rendered on any cause of action accruing after the taking effect of the act (subject to certain exceptions afterwards enumerated), " the family homestead of the head of each family," provided such homestead shall not exceed in value five hundred dollars.

Such homestead shall not be assets in the hands of an administrator for the payment of debts, nor subject to the laws of distribution or devise, so long as the widow or minor children, or any or either of them, shall occupy the same. The sheriff, executing a writ of execution " on application of the debtor or his wife, if such debtor have a family, and if the lands and tenements about to be levied on, or any part thereof, shall be the homestead or estate thereof," shall cause a homestead to be set off.

If the homestead consist of a house, or house and lot, which cannot

be divided without inconvenience, five hundred dollars of the proceeds of a sale thereof may be deposited to the credit of the debtor and his wife in a savings bank, and may be drawn therefrom "only by the joint order of the husband and wife, or by the survivor in case one should decease."

Perhaps it is unnecessary at present, if at all, to refer to other provisions of the statute.

We are forced to admit that, in this as in most of the statutes of similar character, the words employed are not explicit. The law gives us no definition of its most important terms. The exemption is of " the family homestead of the head of each family." But what is a family homestead ? The homestead has been defined " the place where one's dwelling is." Appleton's Am. Cyclopædia. RICHARDSON, C. J., in *Woodman* v. *Lane*, 7 N. H. 245, says,—"A homestead is the place of the house. COKE says,—' Stethe, or sted, betokeneth properly a bank of a river, and many times a place.' Co. Lit. 4 *b.* Homestead, then, means nothing more nor less than ' home place,' or ' place of the home.' " *Austin* v. *Stanley*, 46 N. H. 52. The term " homestead " is used in the statute without further qualification ; but while it is more properly and strictly speaking the home place, or place of the home, yet it has been held in this State that a small piece of land, on which hay is cut for a cow kept at the house where a man lives, may be regarded as a part of his homestead, though the land is separate from the house and a mile distant, provided the house and land together do not exceed five hundred dollars in value, and the land is used in connection with the house to furnish necessary feed for the cow. *Buxton* v. *Dearborn,* 46 N. H. 43.

The home, according to all lexicographers, and in common parlance, is a residence or dwelling-place—it may be a palace or a cot ; and so the homestead or home place of a family—the family homestead named in the statute—must mean the residence or dwelling-place of a family. This it is, then, which is exempted from attachment or levy.

But the exemption is of " the family homestead of the head of each family." The very important question therefore occurs, Who is the head of a family ?

Probably the primary signification would be,—the husband and father of a wife and children residing together; but the term cannot be thus restricted, especially when used in a statute requiring a liberal construction in order " to accomplish the humane object of the law."

Webster defines " family " to be " the collective body of persons who live in one house, and under one head or manager."

Worcester's definition is,—" The persons, collectively, who live together in a house, or under one head ; household."

Within the scope of these definitions, it is manifest that one may be the head of a family who is not a husband or father, provided he is the head or manager of a household of collected persons.

It is a familiar principle that, in the construction of a doubtful law, the contemporaneous construction of persons appointed to execute it

is entitled to great respect. *Edwards's Lessee* v. *Darby*, 12 Wheat. 210 ; *United States* v. *The Recorder*, 1 Blatch. C. C. 218.

Let us, therefore, consider the construction given to this form of expression, or its equivalent terms, in analogous statutes, by the courts in other jurisdictions, in connection with the expressed declarations of the courts concerning the probable intention of the law-makers, and the object and design of such statutes.

The homestead act of Ohio (2 Rev. St. 1145) exempts " the family homestead of each head of a family." SCOTT, J., in *Sears* v. *Hanks*, 14 Ohio 300, 301, says,—." The humane policy of the homestead act seeks not the protection of the debtor, but its object is to protect ·his family from the inhumanity which would deprive its dependent members of a home. Its benefits can only be claimed by heads of families—married persons living together as husband and wife, and widowers or widows having an unmarried minor child or children residing with them as a part of their family. And, in aid of this wise and humane policy, the whole act should receive as liberal a construction as can be fairly given to it."

Now we are constrained to say that a construction like this, which limits the signification of the term " heads of families " to " married persons living together as husband and wife, and widowers or widows having an unmarried minor child or children residing with them as a part of their family," is not quite as liberal a construction as could fairly be given in aid of the " wise and humane policy " of the law.

The Law of Iowa, code of 1851, ch. 81, sec. 1245, declares that " the homestead of every head of a family is exempt from judicial sale."

It also provides (sec. 1246) that a widow or widower, though without children, shall be deemed the head of a family while continuing to occupy the house used as such at the death of the husband or wife." But, independent of the latter section, and in construction of the former, it was held that a widower without children, not continuing to occupy the house used as a homestead at the death of his wife, but subsequently purchasing and moving into a house with his mother and no one else, was to be regarded as the head of a family. *Parsons* v. *Livingston*, 11 Iowa 105. And in the same case it is said,—" It is claimed that the legislature have indicated that the exemption is for the benefit of the widow and children only ; but these sections are intended to provide the manner in which such homestead may descend, and not as defining the persons entitled to such exemption."

In *Whalen* v. *Cadman*, 11 Iowa 226, it was held that an unmarried man, with whom his brother and his brother's wife lived, and for whom they kept house, he furnishing the necessaries for housekeeping and living, was not the head of a family—WRIGHT, J., saying,—" The head of a family is primarily the husband and father. One may be such head, however, without being either. Thus the mother may become such upon the death of the husband. So a son, having a mother, brothers, or sisters, or either, depending upon him for support, and living in a household which he controls, might be such head ;—and thus

we might state many cases where the party claiming exemption would be legally entitled to it, and still not be the husband or father,—and yet in such case he must stand in the place of the father; he must be the master, in law, of the family.

The Code of Georgia, sec. 2013, provides that the homestead of " the head of a family" shall be exempt.

In *Marsh* v. *Lazenby*, decided July 5, 1870, as reported in the Am. Law Reg. for Jan., 1871, p. 8, the court held that " an unmarried man, whose indigent mother and sisters live with him and are supported by him, is the head of a family."

The Constitution of the State of California, art. 11, sec. 15, provides that " the legislature shall protect by law from forced sale a certain portion of the homestead and other property of all heads of families." In this provision, the homestead to be protected is called the property of the head of the family. And in the first and second sections of the act to exempt the homestead and other property from forced sale (Comp. Laws 850), the head of the family is called " the owner " of the homestead. And it is held that " any individual of either sex may be the head of a family. It is not necessary that the head of a family should be a married person." *Revalk* v. *Kraemer*, 8 Cal. 72.

The statute of Illinois exempts " the lot of ground and the buildings thereon, occupied as a residence and owned by the debtor, being a householder and having a family, to the value of one thousand dollars." " Having a wife is having a family." *Kitchell* v. *Burgwin*, 21 Ill. 44.

" The object of the law," it is said, most clearly is to secure the head of the family in the possession and enjoyment of the lot and buildings, for the maintenance and shelter of himself and family, as a home, without any special regard to the extent of the estate or title by which he owned it. * * * We regard the statute as remedial in its nature—intended to remove grievances under which the unfortunate labored, and to save them, amid all their losses and disasters, a shelter for the family—a home. Being remedial, it must be so construed as most effectually to meet the benevolent end in view." Concerning the term " owner " it is said,—" The clear legal import of it embraces as well the owner of a life estate in land as the owner of the fee therein." *Deere* v. *Chapman*, 25 Ill. 610.

In Indiana, the exemption is limited to a " resident householder;" but it has been held to extend to one living with his sister, who contributes to the expenses of the household. 2 Ind. Stats. 367; *Graham* v. *Crockett*, 18 Ind. 119.

In Minnesota, the exemption is to the owner and occupant of the premises as a residence. This may be the debtor himself, his widow, or minor children, who shall be the occupants for the purposes of a home. *Folsom* v. *Carli*, 5 Minn. 337; *Tillotson* v. *Millard*, 7 Minn. 520.

But it is unnecessary for us to determine whether, under the law of this State, an unmarried man may, in any case, acquire a homestead—whether such person, surrounding himself at his residence by a collec-

tive body of persons, who may be aged parents, or brothers and sisters of tender years, or in indigent circumstances, is the head of a family—although to hold otherwise would seem to be contrary to the equity and spirit of an act which has been said to require a liberal construction.

In the present case, the premises had, for many years prior to the death of the tenant's wife in 1858, been occupied by him and his wife and children as their only homestead. After the death of his wife, he continued with two of his children, one of them a minor, to occupy the premises until a period subsequent to the completion of the extent. It will not be pretended that a man is no longer the head of the family because his wife is dead, leaving with him minor children. He would seem to be more the head than ever, when the responsibility and care of the remnant of the family are thus cast solely upon him.

And if the widower provides a home—a shelter and support—for the family, of how many or how few must the family consist in order that he may be the head of it? Of six, or three, or two persons, or of one minor, helpless child?

I suppose it would not be contended that the young man who takes to himself a wife, and provides for her, before any children are born unto him, a home and shelter, is not the head of a family and entitled to a homestead exemption. And if the husband is the head of the wife (Ephesians 5, XXIII) and therefore the head of a family, so, also, is the widower the head of his one motherless child, and thus the head of a family.

Such was the position of this tenant at the date of the levy upon the premises, and, as such, his homestead was exempt from such levy to the extent of the value of five hundred dollars.

Moreover, the extent was made " subject to a family homestead," and the premises were so set off to the demandant, and seizin thereof accepted by him. It seems doubtful what was the intention of the appraisers, who certified that, having examined a certain tract of land, &c., and appraised the same at its just value, they do upon their oaths say, that " the same tract of land is of the value of one hundred dollars, being subject to a family homestead, and no more ;" and that they have set off the same land by metes and bounds as aforesaid, in part satisfaction of the plaintiff's execution.

It would seem that the value of the homestead right was deducted from the amount of the appraisal, and that they intended to set off the reversionary interest.

But how could this be done? what warrant is there in the law for such a proceeding? The method of procedure is clearly pointed out. The sheriff has no power to extend an execution upon the homestead, it being expressly exempt from both attachment and execution—Fogg v. Fogg, 40 N. H. 288; in which case it was held, that if the premises upon which the execution was levied exceeded in value the sum of $500, still, the officer had no power to extend the execution upon the excess

or surplus; that he could proceed only in the mode pointed out by the statute; and, therefore, that the extent of the execution upon the whole land, without first setting out a homestead, after due application, was wholly inoperative and void, even as to the surplus beyond the value of $500. The doctrine of this case was reäffirmed in *Tucker* v. *Keniston*, 47 N. H. 268.

But in the present case the debtor made no application, under the third section of the act, to have a homestead set off to him.

Has he, then, lost all his rights in the homestead by this neglect? In *Fletcher* v. *The State Capital Bank*, 37 N. H. 369, it was strongly intimated that the provision of the third section, giving the debtor the right to have his homestead set off to him upon application to the officer about to levy upon it, was a right not exclusive of all other rights and remedies; that where a remedy is given by statute, in order that a right may be more effectually, or more conveniently or expeditiously enforced, the provision giving the remedy, being intended for the benefit of the party to whom it is granted, is, unless other remedies are expressly excluded, to be considered cumulative rather than restrictive; and that the remedy given by the statute, of a set-off of the homestead by appraisers appointed on application to the officer levying the execution, is intended for the benefit of the debtor, that he may have a more convenient and expeditious method for having his homestead interest assigned to him in severalty, when the estate in which his homestead right subsists is about to be taken on execution, than the more tardy and complicated proceedings of a petition for partition. See *Chesley* v. *Smith*, 1 N. H. 20; Dwarris on Statutes 262.

And in *Fogg* v. *Fogg*, before cited, Mr. Justice BELLOWS says,—" It is clearly the duty of the sheriff to make the assignment [to the debtor upon his application]. It is expressly so provided in the statute, and no other mode of doing it is prescribed. It is true, it has been held that where no application was made to the sheriff to assign the homestead, the right to it could not be regarded as waived or lost, but that other proceedings may be instituted to obtain an assignment of the homestead, at least by the wife after the death of the husband, the court having held that the nature of the provisions of the act is such as to exclude the idea that the remedy provided was to be the only one." And if, as suggested in *Fletcher* v. *The Bank*, the remedy given by the statute, of a set-off of the homestead by appraisers upon the debtor's application, is only intended for the benefit of the debtor, because more expeditious and convenient for him than proceedings for partition or some other tardy and complicated remedy, it is difficult to see why it should be considered that, by neglect to make such application, the debtor's exemption is lost during his life, and a remedy of some sort, not provided by the statute, pertains only to the inchoate and contingent interest of the wife.

We are inclined to regard the proper construction of the third section to be as suggested, and to entertain the opinion that the debtor's right of homestead exemption was not waived or lost by his neglect to

make application to the officer to have the homestead set off to him in severalty.

How does the matter stand, then ?   He has clearly waived the right to have it assigned in the manner pointed out by the statute,and if he has any rights he must resort to some other means for their enforcement. The debtor having failed to insist upon his statutory rights, the creditor is not to be forbidden to extend his execution upon the premises in some way which shall be at least as effectual as if the debtor, taking advantage of his statutory rights, had interrupted the levy by requiring an assignment of the homestead to himself, leaving the surplus to be assigned to the creditor.   And whether or not the creditor might have extended his execution, in these circumstances, upon the whole property, entirely regardless of any supposed right of exemption, we are clearly of the opinion that he might properly proceed in the way adopted by him, and set off the premises " subject to a family homestead." See *Fletcher* v. *The State Capital Bank*, before cited.

The demandant, then, having taken the premises by virtue of the extent upon which he now relies, subject to the homestead exemption, is estopped to deny the validity of the tenant's then existing rights.

The demandant was not a stranger taking under the extent without notice, but he knew all the facts respecting the title and the tenant's claim of an incumbrance upon the property, and took it subject thereto.

It was at his option, perhaps, to treat the claim of exemption as invalid, and to cause the estate to be set off to him in fee at an appraisement, wholly regardless of the debtor's claim, or to treat the claim for exemption as valid and effectual, and take by extent the premises, subject to such claim.   This latter proceeding he has adopted.

The demandant claims under a statute title an officer's extent, which operates only by way of the execution of a statute power, by which nothing passes unless all the circumstances concur in establishing the case on which the power is given.   If there was no homestead exemption there was no reversionary right, and the creditor could not cause such an interest to be set off; and, as an attempt to set off a reversion, the extent would be inoperative and void.   But, as we have seen, the creditor did not undertake to set off the reversion, or if he did his undertaking was ineffectual.   *Tucker* v. *Keniston*, before cited.   On the contrary, by taking the premises under the extent " subject to a family homestead," he chooses to treat such homestead as a subsisting incumbrance, and is afterwards estopped to deny its existence and validity.

Such result would ordinarily be conformable to equity, as well as in accordance with legal principles.   The appraised value must be understood to be the value of the estate over and above the incumbrance. If the demandant could afterwards avoid that incumbrance and hold the whole estate, he might get it for a very inadequate consideration. Therefore it would seem that he should make his election, at the time of the levy, whether he will submit to take the estate subject to the claim of homestead exemption, or whether he will contest it.

. If he adopts the latter course, it would be the duty of the appraisers to make no deduction from the estimated value of the estate on account of the incumbrance, and of the officer to make no exception thereof in his return.

And such would seem to be the only prudent course of procedure in a case like the present, where the debtor has not seen fit to make application for the setting off of his homestead under the third section of the act. See *Russell* v. *Dudley*, 3 Met. 147 ; *Brewer* v. *Hyndman*, 18 N. H. 9 ; *Flanders* v. *Jones*, 30 N. H. 154 ; *Bean* v. *Brackett*, 34 N. H. 102.

This result, however, must be held to have application, in the present case, in which the demandant's claim against the tenant is of greater amount than the probable value of the whole premises, including the homestead, to the condition of things existing at the time of the extent, and not at the date of the commencement of this action.

He took the premises subject to an incumbrance then existing; but it would not be contrary to the equity of the case to hold that, since the whole estate, including the homestead, is not of sufficient value to pay the demandant's just claim, he shall be permitted now to hold the estate discharged of the incumbrance, if the debtor has, since the levy, waived or lost in any way the homestead exemption right then existing, and subject only to which the demandant took the entire estate.

We have seen that the tenant has not lost his right of homestead by neglecting to make application to have it set off to him. *Fletcher* v. *The Bank*, before cited.

The question, then, is presented,—Has the tenant lost his homestead by reason of the death of his wife and the arrival of his children at majority, he still continuing to occupy the premises as and for his own home ?

There was clearly no voluntary waiver of his rights. The only way in which a homestead estate can be effectually waived or released, in this State, is by deed executed by a husband and wife, if the wife be alive, or if dead, leaving minor children, by the deed of the widower, assented to by the judge of probate. *Norris* v. *Moulton*, 34 N. H. 394.

Can a person involuntarily lose a right of homestead once acquired ? Has the tenant ever acquired an exempted homestead in his own right? What is the nature of the exempted homestead estate ? All these inquiries seem to be involved in the main question. Let us consider, for a little more, the nature of this estate.

As already suggested, most of the incidents of estates for life are generally considered as attaching to homestead rights. *Kerley* v. *Kerley*, 13 Allen 287.

Mr. Washburn says that in New Hampshire a homestead right is not an estate; it is inchoate ; not assignable or transferable as something of ascertained value, by the one in whom it vests, until the same shall have been separated and set apart from the general estate out of which it issues. 1 Washb. Real Prop. 350. And some of our earlier decisions upon this subject would seem to warrant the foregoing general proposi-

tion. *Atkinson* v. *Atkinson*, 37 N. H. 434; *Gunnison* v. *Twitchel*, 38 N. H. 67; *Horn* v. *Tufts*, 39 N. H. 485; *Foss* v. *Strachn*, 42 N. H. 42.

But in *Tucker* v. *Keniston*, before cited, and which is the latest of all our decisions under the homestead act, it is said, with reference to the third section,—" a homestead is to be set off, such as the debtor may select, not exceeding $500 in value; that is, the whole property shall not exceed that sum; not a contingent life interest merely, but the entire estate; and against that there shall be no further proceedings. Indeed, in respect to the debtor himself, he is ordinarily the owner of the entire estate, and not of a mere life interest, and so it must have been understood by the makers of the law; and had they intended to exempt from levy and sale only a contingent life interest, while the debtor must be supposed ordinarily to have a fee simple, it is difficult to conceive that such terms could have been used.

And if we examine the previous decisions we shall find that the terms "inchoate" or "contingent" estate or interest have reference to the expectant estate of the widow or minor children, after the death of the husband and father, rather than to the estate existing prior thereto. In California, as we have seen, the head of the family is designated in the law as the owner of the homestead estate. Const. of Cal., art. 11, sec. 15; Cal. Comp. Stat. 850.

Indeed, that can hardly be called a contingent or inchoate estate of the head of the family, which may be carved out of the larger estate and set apart for the general owner at any time during his own life, if not upon application to the officer levying an execution upon the general estate, then by subsequent proceedings for partition, or in some other mode. It seems to be in no proper sense inchoate as to the debtor, nor contingent, except as he may lose it by voluntary sale or abandonment.

Our statute vests the homestead in the head of the family. Others may have inchoate and contingent rights it it, but it is his homestead in his own present right, as general owner, and not as a trustee merely. " By its express terms the act exempts the homestead, which it sets up in the lifetime of the owner for his benefit, from the operation of the laws for the compulsory payment of his debts; restrains him, in favor of his wife, from the voluntary alienation of it without her consent, and in favor of his children, if she be dead, without the consent of the judge of probate acting for them." *Norris* v. *Moulton*, 34 N. H. 395.

The debtor is " at full liberty to sell, exchange, or mortgage his homestead, subject only to the claims of his wife and minor children. *Tucker* v. *Keniston*, before cited.

During the life of the husband and father, neither his wife, nor minor children claiming under him, are entitled to a family homestead against the covenants of his deed, even when after his death they might be thus entitled. *Strachn* v. *Foss*, 42 N. H. 47.

Said BELLOWS, J., in *Fogg* v. *Fogg*, before cited,—" The general object of the law is like other laws exempting property from attachment and execution, with further provisions in favor of the wife and children of

the debtor, by the force of which they may, under certain circumstances, acquire an interest in the homestead. As to the wife and children, their interest is justly regarded as inchoate, but as respects the debtor himself, in whom the estate is already vested, the law was designed to exempt the homestead altogether from attachment and execution."

"In respect to the husband, the entire estate is vested in him." *Tucker* v. *Keniston*, before cited.

If, then, the tenant had a vested interest in the homestead, exempt from attachment or levy during the life of his wife and the minority of his children, has he lost it?

This precise question has been deliberately considered and determined in but three States of the Union,—namely, in Massachusetts, Texas, and California. In the latter jurisdiction, the case of *Revalk* v. *Kraemer* came up for adjudication in 1857. 8 Cal. 66. The plaintiff was married in 1854, and he and his wife resided upon the premises in controversy from that time until her death in 1856. The main question was, whether the husband still retained a homestead in the premises; or, as the court expressed it, "whether the privilege of the homestead ceases when the party ceases to be the head of the family. Whereupon BURNETT, J., proceeds as follows:

"The leading idea upon which the constitution and statute are both predicated is the protection of the family. To carry out this intent, the homestead of the head of the family is protected from forced sale. Any individual of either sex may be the head of a family. It is not necessary that the head of a family should be a married person.

But unless the person is the head of the family, the right of homestead cannot exist. And cannot the same person at one time be the head of a family, and not at another?

And if the privilege is incident to a certain state, and that state itself ceases, why should not the incident fall with it? As the primary object of the law was the protection of the family, when the family ceases to exist the reason for the privilege is gone, and why should not the privilege itself also cease? As the end contemplated by the law can no longer be attained, why should the means be preserved when they are no more wanted? As the law will not allow an individual the right of homestead before he becomes the head of a family, why should it allow him this right after he ceases to be such? The very reason why the law will not allow it in the one case, is equally applicable in the other. When an individual has not been, or has ceased to be the head of a family, the law cannot anticipate that he will thereafter become such in either case. When he does in fact become the head of a family, then the law protects him for their benefit. He is the representative of the family. But when there is no family to protect, will the law defeat the just claims of creditors for the purpose of accomplishing no beneficial end? It is true, the party once had a family, and he also once had protection for that family; but since the family has ceased to exist, the protection is not needed. The law

intended to protect individuals while bearing certain relations towards
each other. When that relation ceases, the cause of the protection
is gone. The reason ceasing, the rule ceases. The privilege and re-
sponsibility must go together. One is rightfully dependent upon the
other. When the individual has no longer the cares of a family, the
law should not still protect him as if he had; he should only be pro-
tected as others are who are at present in the same state. The law
does not look to his past or future, but to his present condition." To
the same effect is a *dictum* in *Green* v. *Marks*, 25 Ill. 221. But in
Massachusetts a very different doctrine is enunciated. The exemption
there is to " every householder having a family." Gen. Stats., ch. 104,
sec. 1.

In *Doyle* v. *Coburn*, 6 Allen 71, it was held that " an estate of home-
stead is not defeated by the removal of the wife and children of the
householder from the premises, or by her obtaining a divorce from bed
and board; and a decree giving to her the custody of the children, if
he continues to reside thereon; nor can she by her own separate act
deprive him of such estate."

And DEWEY, J., delivering the opinion of the court, remarks,—" Nor
did the separation of the husband and wife, as shown by her withdraw-
al in 1861, taking with her the child, defeat the homestead estate.
The defendant has personally occupied the same as his place of resi-
dence up to the present time. He acquired his homestead as ' a house-
holder having a family.' It is not necessarily lost by the death or ab-
sence of his wife and children. Others may be adopted as members
of his household, and his homestead retain its existence.      *       *
The homestead exemption is for the benefit of the husband as well as
the wife."

In *Silloway* v. *Brown*, 12 Allen 30, GRAY, J., says,—" The home-
stead right of a householder in land owned by him is an estate for his
life, and for the additional term of the continuous subsequent occupa-
tion of his widow or any of his minor children. It is secured to him
by law for the common benefit of his wife and children, as well as
himself.       *       *       Although a homestead cannot be acquired ex-
cept by a householder having a family, yet, when once acquired and
still occupied by him, it has been held not to be defeated or lost by the
death or absence of his wife and children. Any other construction
would render a husband, who had been deprived of his family by acci-
dent or disease, or by their desertion, without any fault of his, liable
to be instantly turned out of his homestead by his creditors.

" As this defendant, at the time of the passage of the statute of
1855, ch. 238, lived upon these premises as his homestead with his
wife and son, he acquired, under that statute, a homestead estate
therein to the extent of eight hundred dollars in value, which was not
affected by the subsequent death of his wife and the coming of age and
departure of his son, so long as the father continued to occupy the
premises as his house."

The statute of Texas, like ours, exempts " the homestead of the head

of each family." The supreme court of Texas has decided that "the death of the wife while it was the husband's homestead, and his having no children, did not destroy its distinctive character of a homestead : he continued to reside there with his slaves, hirelings, and niece, and her husband, Mr. McAllister. If he had been without servants, or any one with him after the death of his wife, it would have been his homestead so long as it continued to be his residence." HEMPHILL, C. J., in *Wood* v. *Wheeler*, 7 Texas 13 ; *Taylor* v. *Boulware*, 17 Texas 77.

The laws of Massachusetts, Texas, and California are analogous with our own in respect to the person entitled to the right of exemption, and these decisions are pertinent to the question now under discussion.

The law of Vermont exempts " the homestead of every housekeeper or head of a family, occupied by such person as a homestead." It also provides that " such homestead shall not be alienated or mortgaged by the owner thereof, if a married man, except by the joint deed of the husband and wife. Comp. Stats. 390, 391.

In *Davis* v. *Andrews*, 30 Vt. 681, it is said,—" This right of homestead exists by the statute in the lifetime of the husband, to be sure, and cannot be taken by the creditors of the husband ; but, during the life of the husband, it is the husband's right of homestead and not the right of the wife and children. The wife's right of homestead has very properly been likened to the wife's right of dower at common law." And in *Howe* v. *Adams*, 28 Vt. 544, REDFIELD, J., remarks,—" The homestead law does not vest any title in the wife of the householder, as to the. homestead. It is much like a right of dower at common law, which the wife could only bar by joining in the conveyance in a prescribed form. * * It is a sort of lien or mortgage upon the estate of the husband in favor of the wife."

In Minnesota, where the exemption is to the owner and occupant of the premises, as a residence, it is essential to its being exempted that it should be occupied by the debtor, or his widow or minor children. *Folsom* v. *Carli*, before cited ; *Kelly* v. *Baker*, 10 Minn. 154.

The first exposition of the homestead law of New Hampshire is contained in the opinion of the court, SAWYER, J., in *Norris* v. *Moulton*, 34 N. H. 392, wherein it is declared that it is obvious that the homestead contemplated by the act is not only to be exempted from attachment and levy or sale on execution against the owner in his lifetime, and for the benefit not merely of himself, but of his wife, if living, and of his minor children." The law " exempts the homestead which it sets up in the lifetime of the owner for his benefit," &c. " The homestead exemption exists during the life of the husband, equally whether he be a debtor in execution or not."

In *Fletcher* v. *The State Capital Bank*, before cited, it is said that " it is too clear to admit of doubt that the policy and aim of the act were not intended to be of this narrow and restricted character. [That is, restricted to the estate of a debtor about to be levied upon.] It has a more liberal and consistent purpose, in securing to all alike the benefits of the homestead which it creates as a right in the head of every family

during his life, and in his wife and minor children at his decease, whether he may or may not have been a judgment debtor.   *   * It establishes the right in the head of each family, for the benefit of himself during life, and his wife and minor children at his decease.

In *Austin* v. *Stanley*, 46 N. H. 52, DOE, J., says,—"The statute was specially intended to secure to debtors and their families the shelter of the homestead roof."

In *Philleo* v. *Smalley*, 23 Tex. 498, a homestead is declared to be " a place where a man eats and sleeps, and surrounds himself with the insignia of a home"—a definition approved by BELLOWS, J., in *Tucker* v. *Keniston*, 47 N. H. 270, in which case it is held that the law exempts the homestead, and not any contingent, reversionary, or other particular interest in the home farm or place.

" Conditions subsequent, when relied on to work a forfeiture of the estate, must be created by express terms or clear implication, and are construed strictly "—2 Washb. Real. Prop. (3d ed.) 6 ; or, as expressed by NESMITH, J., in *Locke* v. *Rowell*, 47 N. H. 49, " liberally in favor of the holder of the estate." See *Emerson* v. *Simpson*, 43 N. H. 475.

In accordance with this principle of construction, it was held, in *Locke* v. *Rowell*, before cited, that it can only be the unequivocal purpose or act of the party entitled to the exemption, which should deprive such party of the estate.

Reverting again, for a moment, to our statute of 1851, what principle shall govern the construction of it ?

Its object has been declared to be the encouragement of poor debtors. *Gunnison* v. *Twitchel.* It is said to be intended for the benefit of the husband, as well as his family. *Norris* v. *Moulton ; Fletcher* v. *State Capital Bank.* " The general object of the law is like other laws exempting property from attachment and execution, with further provisions in favor of the wife and children of the debtor, by the force of which they may, under certain circumstances, acquire an interest in the homestead." *Fogg* v. *Fogg*, before cited ; *Doyle* v. *Coburn*, before cited.

Its general policy is to secure to those entitled to its benefits the shelter of a home.   1 Washb. Real Prop. 326. · It is a remedial statute.   *Deere* v. *Chapman*, 25 Ill. 610.   " Such a statute, it is universally held, is to be liberally construed, and that everything is to be done in advancement of the remedy that can be given consistently with any construction that can be put upon it." See Judge POTTER'S note to Dwarris on Statutes 73, and authorities cited.

" Receiving an equitable or rather a benignant interpretation, the letter of the act will be sometimes enlarged, sometimes restrained." Dwarris on Statutes 231.

" In construing a remedial statute which has for its end the promotion of important and beneficial public objects, a large construction is to be given when it can be done without doing violence to its terms." *Wolcott* v. *Pond*, 19 Conn. 597 ; *Pearson* v. *Lovejoy*, 53 Barb. 407.

Again, a remedial statute shall be extended by equity to other persons besides those expressly named.   Dwarris on Statutes 233.

Upon all these considerations, we are inclined to the opinion that the tenant has not lost his right of homestead by the death of his wife and the dispersion of his children ; that he is still entitled to the shelter of a home, exempt from the claims of creditors ; that there is nothing in the act (to adopt the language of the tenant's council) which requires the harsh interpretation that he shall lose his homestead merely because of the death of his wife, which was the act of God, and which the tenant could not prevent.

We may conceive the case of a poor debtor, entitled to, acquiring, and enjoying a homestead during all the years of a long and laborious life. His children have grown to man's estate and have all departed from the paternal roof, it may be to distant lands, where they have established their own homes and surrounded themselves with their own families : it may be that they have all died.

At last the wife dies, and the father is left alone in the dwelling which he has always called his home, and which is endeared to him by fondest associations and by sacred memories. He is too old and feeble to acquire another. Shall he be turned out of the old homestead because of the inevitable fate which has deprived him of his wife ?

Or, we may take the case of the young man who by habits of industry and frugality has acquired just enough property to purchase a shelter for himself and the young wife who is to share it with him. No child is born to them, and in a few weeks, or months it may be, the wife dies, and the young man is no longer, in strict construction, the head of the family. Shall he, too, therefore, be deprived of his homestead, and so, perhaps, of the opportunity of marrying again and adopting other members of his household ?

Such a construction is not required by the terms of the act. Such a construction would be strict, exclusive, harsh, unjust, illiberal, and subversive of the " humane policy of the law." See *Buxton* v. *Dearborn*, before cited, and most evidently not according to the intention of the law-makers.

The California case is predicated upon the ground that the homestead exemption is solely " for the protection of the family ; " the Massachusetts and the Texas cases, upon the ground, assumed in several of our own decisions, that " the homestead exemption is for the benefit of the husband as well as the wife." *Doyle* v. *Coburn, Norris* v. *Moulton, Fletcher* v. *The State Capital Bank, Fogg* v. *Fogg*, before cited.

The counsel for the demandant contends that the language of the third section of the act is inconsistent with this construction ; that wherein it provides for the setting off of the homestead by the officer, upon application of the debtor or his wife, " if such debtor shall have a family," these words import that no such estate shall be set off on application, unless such debtor shall have a family.

Such is not our interpretation of the law. If the statute, independent of this provision, is to receive the construction for which the demandant contends,—if the debtor can have no right of homestead

except he shall have a family,—it would be quite superfluous, not to say absurd, to provide that such homestead shall only be set off on the application of the debtor or his wife, "if such debtor shall have a family." But if the opposite construction be adopted, the section in question seems to be in full harmony with it, because then the interpretation of the section will be that, upon application of the debtor alone, if he has no family, the homestead may be set off, and if he have such family, it may be set off upon application of the debtor or his wife.

The fourth section of the act also furnishes an argument in favor of our construction. It provides that in case (in a contingency suggested by the terms of the section) the estate of the debtor, including the homestead, shall be sold by the officer levying an execution thereon, five hundred dollars of the proceeds may be deposited in a savings bank to the credit of the debtor and his wife; "and the same may be withdrawn therefrom only by the joint order of the husband and wife, or by the survivor in case one should decease."

The policy of the act is to preserve a homestead for somebody. If five hundred dollars in money is exempted and retained from the sale of the homestead, it must be for the purpose of enabling the survivor still to have a homestead, by giving him the means wherewith to purchase another. The survivor is as likely to be a widower as a widow, and he may be a widower without minor children. The law does not provide that the money shall be paid to the widower, with the consent of the judge of probate, representing or protecting the interests of those children; but the children are entirely ignored, and, children or no children, the money "may be withdrawn by the survivor."

It being determined, then, that the tenant has not lost his right of homestead exemption by his neglect to make application to the officer levying the execution to have the same set off to him, nor by the death of his wife and the dispersion of his children, the question now arises,— By what remedy or form of procedure may he assert and protect his rights? "Can it be," said BELLOWS, J., in *Fogg* v. *Fogg*, which was a writ of entry, "by a defence to this suit? and, if so, by what form of plea? Can he disclaim, or plead non-tenure as to all but $500 worth of the land? If so, is the value at the time of the extent or at the filing of the plea to govern? and in what way is the part disclaimed to be described? It is clear that it cannot be by metes and bounds, or by any description that will inform a sheriff what to deliver.    *    *    * He cannot, then, by any known rules of pleading, defend this suit, if it be assumed that the extent is valid in whole or in part."

And we have no hesitation in saying that the tenant can make no defence to this action. "The right of homestead, before the same has been set out and assigned, is not such an estate in land—such a subsisting legal title or interest—as will bar a writ of entry." *Foss* v. *Strachn*, 42 N. H. 42; *Silloway* v. *Brown*, before cited.

Is the administration of the law, then, subject to this reproach,—that the defendant, having indisputable equitable rights in the premises, can in no way be protected in the preservation and enjoyment of them?

We should be sorry to feel compelled to answer this question affirmatively.

The practicability of relief by a bill in equity to stay proceedings in the writ of entry is suggested in *Fogg* v. *Fogg*, but seriously questioned ; while in *Strachn* v. *Foss*, 42 N. H. 44, proceedings in equity are indicated as being appropriate to a condition of things somewhat like the present. And see *Atkinson* v. *Atkinson*, 37 N. H. 434, and *Horn* v. *Tufts*, 39 N. H. 485, in which cases proceedings by petition for partition, as well as by bill in equity, are suggested. See, also, *Tucker* v. *Keniston*, before cited, where it is distinctly decided that where an officer, after application to set out the debtor's homestead, without setting it out undertakes to dispose of it, a court of equity will interfere by injunction, founded upon a bill *quia timet*, to remove a title or claim which may operate as a cloud upon the title of the owner.

But the court in Massachusetts seem to have found a way of escape from the difficulties which surround us, and which we are inclined to adopt for our own deliverance and for the protection of the acknowledged rights of this tenant.

The demandant's and the tenant's rights are substantially those of tenants in common, holding by several and distinct titles, but by unity of possession. In *Silloway* v. *Brown*, before cited, GRAY, J., remarks as follows : "The defendant, then, occupying the land, and having an estate of homestead therein which had not been set off to him, what was the nature of his interest and of his relation to the purchaser of the residue of the land ?

"The land was of greater value than the law allows to be exempted as a homestead ; the title of the land, subject to the right of homestead, had passed out of him ; and he, continuing to occupy the premises, held by a distinct title, for his own life at least (though defeasible by alienation according to law, or by acquiring another homestead), an undivided part of the land, to the extent of the value of the homestead estate,— * * * judgment recovered against the householder or his widow upon a writ of entry, either in ordinary form or to foreclose a mortgage, would be subject to his estate of homestead and to the possession incident thereto—citing *Castle* v. *Palmer*, 6 Allen 401; *Doyle* v. *Coburn*, *ibid* 71. Upon the levy of an execution by extent upon the land, the amount of the homestead exemption, in the absence of any statute providing otherwise, might be deducted from the appraised value of the land. *Pittsfield Bank* v. *Howk*, 4 Allen 347 ; *Castle* v. *Palmer*, 6 Allen 403. The estate of the judgment creditor would be thus left in common with that of the owner of the homestead, much as in the case of a levy upon the interest of one tenant in common. * * The homestead estate differs, indeed, from ordinary estates held in common, in not being an aliquot part of the land, but measured by value only, which may be constantly fluctuating. See *Richards* v. *Chace*, 2 Gray 385. And this court has held that a homestead right cannot be originally acquired in land held by the claimant of the homestead in common with a stranger. *Thurston* v. *Maddocks*, 6 Allen 427.

" But when an estate of homestead has once been acquired in land, of a greater value than the limit of the homestead exemption, and the surplus has been alienated by levy of execution or sale, according to law, the owner of the homestead and the owner of the residue each have a right of immediate possession and enjoyment of the land, as is clearly shown by the decision already cited, that the owner of the residue may maintain a writ of entry to recover the land subject to the right of homestead, and to the possession incident thereto. *Castle* v. *Palmer,* 6 Allen 401. Their rights in this respect are exactly those of tenants in common, according to the elementary definition : ' Tenants in common are such as hold by several and distinct titles, but by unity of possession, because none knoweth his own severalty, and therefore they all occupy promiscuously. This tenancy, therefore, happens where there is a unity of possession merely, but perhaps an entire disunion of interest, of title, and of time.' 2 Bl. Com. 191. The facts that the defendant had an estate for life and the plaintiff an estate in fee, that the defendant held by virtue of the homestead act and the plaintiff by purchase from the defendant's assignee in insolvency, and that the defendant acquired his title long before the plaintiff purchased his, do not make them the less tenants in common by reason of their unity of possession."

Two questions of slight importance remain for disposition.

It is suggested by the defendant that the execution upon which the extent was made was returnable at the second subsequent term from the date thereof. This was authorized by law—chap. 2083, Laws of 1858 ; and it is to be presumed, until the contrary is made to appear, that the execution was regularly issued, *in conformity with the provisions* of the statute.

The validity of the extent is also contested on the ground that it appears by the officer's return that the levy was commenced by the swearing into office of an appraiser on the 11th day of October, 1865, which date was two days before the rendition of judgment on the 13th of October, and five days before the issuing of execution on the 16th of the same month. But it is manifest that the officer has inadvertently made a mistake in his return by substituting the word October for November, since it appears by the certificate of the oath of the appraisers that they were sworn in on the 11th of November, and not on the 11th of October.

It is not necessary that the officer should amend his return. The certificate of the administration of the oath to the appraisers is a part of the return, and, taking the whole together, aided by the presumption of law that all acts of an official nature are to be presumed to be rightly and duly performed until the contrary is shown, the extent must be taken to have been properly made, in all matters merely formal. Co. Litt. 6, *b ;* Broom's Leg. Max. 729.

The conclusion of the whole matter is, that the tenant, under the plea of *nul disseizin* with the brief statement annexed, may properly maintain and set up his homestead estate as a bar to an absolute recovery of the premises by the demandant.

The homestead right, of which he has not been divested, either by lapse of time, by his own laches, nor by the providence of God, secures to him the enjoyment of the premises to that extent. Of this he is not to be divested by this extent.

It is competent for this court to enter such qualified judgment as may be necessary to effectuate the purposes of justice. The effect of such judgment will be to leave each of these parties in the enjoyment of so much of the estate as belongs to them severally. Under Gen. Stats., ch. 228, sec. 1, the tenant or the demandant may cause partition to be made, and the homestead estate to be set off. *Castle* v. *Palmer*, 6 Allen 404; *Doyle* v. *Coburn, ibid* 73.

The proper entry of judgment in this case will be in favor of the right of the demandant to maintain the action for the recovery and possession of the demanded premises, subject to a family homestead of the tenant therein to the extent of $500 in value; to take effect after the termination or separation of the homestead estate. A formal entry to that effect may be made, which, however, is not to interfere with the enjoyment of the homestead estate by the tenant, so long as that estate continues.

At the March trial term, 1872, after the foregoing case was decided, said Barney filed his petition for partition against said tenant (Leeds).

August 11, 1863, the plaintiff brought a suit against the defendant and caused the premises to be attached. October 13, 1865, the plaintiff obtained judgment, and commenced the levy of his execution on the premises November 11, 1865, and completed the same September 22, 1866, the premises being set off to the plaintiff at the sum of $100, in part satisfaction of his execution, subject to a family homestead. Upon that levy the plaintiff brought a writ of entry against the defendant August 16, 1870, and at the March trial term, 1872, had judgment for a writ of possession, subject to the defendant's homestead of $500, according to the opinion and order of the court at the preceding law term, in March, 1872.

The court reserved the question whether the value of the homestead is to be determined by the committee in this proceeding, as of the time when partition is made, or as of the time of the completion of the levy, or any other time.

*Murray*, for the petitioner.

We claim that the value of the homestead is to be determined at the time when partition is made.

The plaintiff had judgment for a writ of possession, subject to the defendant's homestead of $500. This was according to the opinion of the court at the law term. The defendant is entitled to that value when the homestead is set out. When the original levy was completed, either party could have had the homestead assigned. *Silloway* v. *Brown*, 12 Allen 30.

If the creditor made no application for partition till the property had so diminished that the debtor's homestead covered the whole of the premises, he has no one to blame but himself. So, on the other hand, if the property should increase in value it would belong to the creditor. It was his, subject to the defendant's homestead. The debtor cannot complain, for he gets his homestead of the value of $500 whenever it is assigned to him. If it had been assigned to him and had increased in value, the overplus could any time be taken on execution. *Stubblefield* v. *Graves*, 50 Ill. 103. We fail to see how any other rule could be adopted, that would work justice to all parties. The statutes give the defendant a homestead of $500 whenever it is assigned to him, and by this rule he gets it, and this is as favorable to the debtor as any other that can be adopted. The plaintiff and the defendant are tenants in common. The defendant has a homestead estate, the plaintiff the remainder. Partition is prayed for, and a committee appointed. Now, should they set out to the defendant a homestead of the value of $500 at the time of partition? or, a piece of land that several years ago was valued at $500? We think the law contemplates no other value than the value at the time partition is made.

The opinion of the court was, that the plaintiff should have judgment for a writ of possession subject to the defendant's homestead of $500. Would it satisfy the law to set off five sixths to the defendant and one sixth to the plaintiff? The five sixths might now be worth more, or less, than $500, and in that way the defendant might not receive more than three or four hundred dollars in value. Would that answer? We submit that it would not be in accordance with the decision of the court.

*Shirley*, for the defendant.

It is clear that at the precise hour of the completion of the levy this defendant, by the pointed terms of the statute, had a homestead estate· of the value, at that time, of five hundred dollars. He had " an estate "—not a mere right—which he could then exchange for another, mortgage, or otherwise dispose of. *Tucker* v. *Keniston*, 47 N. H. 267, 268.

It is very clear that at the date of the extent he was entitled to have five sixths of the premises set out to him by partition or bill in equity. See *Fogg* v. *Fogg*, 40 N. H. 284, 285. The extent fixes " the value " of the share of the creditor at that time. *Ib.* 285.

How has the plaintiff's share shrunk since then from one sixth to nothing, or risen to four ninths of the whole? The plaintiff really proposes to compel this defendant to take, instead thereof, what three men may judge it to be worth *six* years at least *after* the levy. God, or his own act, could alone divest the defendant of any part of the estate " valued " to him by the plaintiff at the time of the levy.

He certainly has " waived " no rights. He could waive none without a deed, because such waiver is positively prohibited by statute.

Whatever his rights may have been as between him and others, it is clear that as respects this plaintiff, upon the points raised, he has every right which he had at the date of the levy.

The value of five hundred dollars was vested in him *then;* the law did not give him a right then to have an estate set out to him, which might be valued at five hundred dollars in ten years or a century to come, but an estate worth five hundred dollars then ; and he had that right then, whether he or some one else applied to the sheriff to have it set out or not.

The levy was made subject to that right.    Had it been made otherwise, the levy would have been a nullity.    Whoever takes an estate subject to the right, interest, or estate of another, takes it *cum onere*— takes it subject to the weight of the burden as it then exists.

The levy was the execution of a statute power; it fixed one hundred dollars as the "just value" of the plaintiff's interest at that time, and from necessity fixed the "just value" of the defendant's homestead estate at the same time at five hundred dollars, and made the parties tenants in common from that hour.

It is evident the plaintiff thought the premises incapable of division. It was impossible, then, to make the levy without fixing the value of the whole premises at that time, and then fixing such value to the share set off to the plaintiff by deducting from the entire value such value of the defendant's interest then.    Without an appraisal of the whole premises, no step could have been taken towards a levy.    If the appraised value at that time failed to exceed five hundred dollars, the proceedings practically ended.    When the appraisal exceeded five hundred, the statute furnished a rule fixing the proportionate interests of the parties at that time.

This proceeding is bottomed on that levy.    The plaintiff saw fit to imbed the defendant's rights in that levy.    He is, in every sense, estopped from saying that the defendant is not entitled to what that levy concedes to him—a homestead estate worth five hundred dollars at that time.

The plaintiff's theory seems to us a strange one.    It is, in substance, that a plaintiff who makes a levy has an estate, or not, according as the land may rise or fall in value.    It is apparent that if the buildings on the premises had been burned down, that the entire valuation would have been much less than five hundred dollars.    Suppose the levy was made just as it was and had been perfected, and that the day after the flames had consumed the buildings, that meantime (as was done in the present case) the plaintiff had entered his petition for partition, that his estate of one hundred dollars and all his rights in said premises had been destroyed,—how could he maintain his petition? If he had no interest he could not maintain it.

Has any member of the court ever heard of a plea on the part of a defendant, setting up that at the date of the levy the plaintiff had an interest of one hundred dollars in the premises and was entitled to partition thereof, but that since said levy the house had burned down

or the real estate had so fallen as to be of the " just value " of $300 .
and no more, and therefore the plaintiff, having no interest or estate in
said premises, is not entitled to partition therein ?

If such an anomaly has been seen, has the court ever seen a replica-
tion setting out that the facts stated in said plea were true, and that
such " just value " was no more than $300 on the day stated, at
twenty-three minutes past ten A. M. ; but that thereafterwards, to wit,
at twenty minutes past one P. M., a certain railroad corporation had
laid out a depot adjacent thereto, or had, by itself or through some of
its understrappers, established a saw and other mills in the vicinity
thereof, all which had so raised the " just value " of said premises to
the sum of $900, whereby the plaintiff had an estate therein of
four ninths thereof, and so could bring partition therefor ?

It seems to us that the court would be as much amazed at such
pleadings as the chief justice was at the thought of certain others,
in *Fogg* v. *Fogg*, 40 N. H. 289.

Some of these positions seem so clear to us, that we have some deli-
cacy in attempting to argue them.

The authorities, cited by the counsel for the plaintiff, can have no
possible bearing upon the case.

The case cited from Illinois is simply this : A sues B, who has a
homestead set out to him, which, in progress of time, increases to a
marked extent beyond the homestead right as prescribed by law—if
the value at the latter date is the test. C, who never had any privity
with A, brings a suit against B, who sets up the right to the homestead
as originally set out to him, although it far exceeded, at the time of
the latter levy, the amount *then* allowed by statute. The court held
that as C was not privy to the first proceedings, he was not estopped by
them, and that, as to him, the homestead must be set out *de novo*.
The court, in this case, intimate that if A brought a second suit he
might be so estopped.

It seems to us that the former opinion in this case (51 N. H. 253) is
decisive against the view taken by the plaintiff's counsel.

FOSTER, J., says,—" The first question presented is, whether, at the
time of the extent of the execution upon the demanded premises, the
tenant had any right of homestead therein."      *      *      *      " Such
was the position of this tenant at the date of the levy upon the premises,
and as such his homestead was exempt from such levy to the
extent of the value of five hundred dollars."      *      *      *      " More-
over, the extent was made ' subject to a family homestead,' and the
premises were so set off to the demandant and seizin thereof accepted
by him."      " The demandant *then* having taken the premises by virtue
of the extent upon which he relies, subject to the homestead exemp-
tion, is estopped to deny the validity of the tenant's then existing
rights."      " The appraised value must be understood to be the value of
the estate over and above the incumbrance."      *      *      *      " This
result must be held, however, to have application in the present case,
in which the demanda-s claim against the tenant is of greater

amount than the probable value of the whole premises, including the homestead—to the condition of things existing at the time of the extent, and not at the date of the commencement of this action." * * " He took the premises subject to an incumbrance then existing." Words of ours can add nothing to the clearness and force of this statement.

The counsel is in error :—The defendant's right to a homestead and to its value are not acquired by and do not depend on his application to have them set out ; otherwise a man would have no homestead unless somebody sued him.

The opinion of the court upon the questions thus reserved was delivered at the August (adjourned) term, 1872, and was as follows :

FOSTER, J.  We regard the question presented by this case as having been practically settled by the prior decision of the cause, although the precise question now before us was not then suggested.

The extent of the plaintiff's execution upon the defendant's premises was completed Sept. 22, 1866, at which time, by proceedings conformable to the requirements of the law, the appraisers declared the whole estate shown them to be " of the value of one hundred dollars, subject to the family homestead, and no more." That is to say, they appraised the whole estate at six hundred dollars, the debtor having an exempted estate therein of the value of five hundred dollars ; and the appraisers thereupon set off the whole land by metes and bounds at that sum, in part satisfaction of the execution.   That is to say, they did not set off the reversion, nor one sixth of the whole ; but they set off the whole property subject to an exempted right therein to the extent of five hundred dollars, and the sheriff thereupon delivered seizin and possession of the entire premises to the creditor.

What, then, was the position of the parties, creditor and debtor, at that time ?

The family of the debtor was entitled, as against the creditor, to so much of the estate set off by the appraisers as should not exceed in value five hundred dollars.   Laws of 1851, ch. 1089, sec. 1.

The precise quantity was capable of ascertainment, and might have been then specially assigned to the debtor by metes and bounds upon his request.   Upon such request, the appraisers would have been required to set off a homestead by metes and bounds, of the value of five hundred dollars and no more.   Laws of 1851, ch. 1089, sec. 3.

The legislature had fixed the value of the exemption, and the creditor was entitled to the residue.   The debtor became then, and has since continued, a tenant in common with the creditor of so much and no more of the estate as was then of the value of five hundred dollars. At the time of the levy of the execution, he was entitled to the special assignment of his share ; and ever since then he has been and is now entitled to partition, and to hold his share in severalty.

The extent, in quantity, of that share could only be determined by assignment under the statute, or by partition. It was not necessarily five sixths or any other aliquot part of the premises, although at the time of the levy such was deemed his fair proportion of the whole by the appraisers; but it was so much, whether five sixths, one sixth, or any other proportion, as was worth five hundred dollars. The policy of the law gave the creditor all the rest.

If the debtor had chosen to avail himself of his right to a special assignment then, of course the creditor could not complain if, subsequently, the portion of land especially assigned to the debtor had risen in value, any more than the debtor would have the right to complain of the rise in value of the estate which remained to the creditor.

Neither would the creditor have the right to complain if, having taken the debtor's land subject to an estate of five hundred dollars, it should turn out, upon subsequent partition, that, by reason of a diminution in value of the whole estate, the creditor had in fact secured nothing by his levy.

In the former decision in this case we said,—" This result [the holding that the debtor had not lost his homestead right by neglecting to make application to have it set off to him under the third section of the act of 1851] must be held, however, to have application in the present case, in which the demandant's claim against the tenant is of greater amount than the probable value of the whole premises, including the homestead, to the condition of things existing at the time of the extent, and not at the date of the commencement of this action.

" He took the premises subject to an incumbrance then existing; but it would not be contrary to the equity of the case to hold that since the whole estate, including the homestead, is not of sufficient value to pay the demandant's just claim, he shall be permitted to hold the estate discharged of the incumbrance, if the debtor has, since the levy, waived or lost in any way the homestead exemption right. then existing, and subject only to which the demandant took the entire estate,"—a predicament from which, however, we found the debtor to be free.

When the creditor, at the date and by means of the extent, takes from the debtor all but a certain interest, the share taken and the share left are fixed by law. The estate of the creditor and the estate of the debtor are then determined. That of the debtor is such a quantity of land as is then of the value of five hundred dollars; that of the creditor is the residue. The precise quantity of the estate of each is fixed by law, and is ascertainable at the option and upon the application of either tenant in common of the entire estate, for a partition of it.

The estate vests in the creditor by the act of the law, providing for a levy of the execution upon the debtor's land; and the quantity of the estate thus vested in the creditor, and consequently the quantity remaining in the debtor, are subsequently ascertained, in the method most practicable, with reference to value at the time when the intervening right of the creditor took effect and vested an estate in him.

Any other rule would leave the quantity and value of the estate of

tenants in common, which had not been fixed by definite fractional portions, always uncertain and fluctuating, while this rule is simple, logical, practical, and certain.

In accordance with these views is the suggestion of BELLOWS, J., in *Fogg* v. *Fogg*, 40 N. H. 285, that "the condition of the property at the time of the levy and extent would doubtless be the guide   *   *   *   in respect to value, when the land is set off to the creditor."

The result of these considerations is the conclusion that, in making partition of these premises, the committee should assign to the defendant, by metes and bounds, so much of the estate in controversy as they shall find to have been of the value of five hundred dollars on the 22d of September, 1866.